Gulf & Ship Island Railroad Company *v.* Charles M. Bussey et al.

1. RAILROAD.  *Fellow servant.  Constitution* 1890, *Sec.* 193.  *Code* 1892, § 3559.

   Constitution 1890, § 193, touching the application of the fellow-servant rule in the case of railroad employes, has no application to an action based on the negligence of the railroad company itself, in failing to provide a safe road bed.

2. SAME.  *Contributory negligence.*

   Facts considered, and the defense of contributory negligence adjudged not to have been made out.

FROM the circuit court of, first district, Hinds county.

HON. ROBERT POWELL, Judge.

Bussey and others, appellees, were plaintiffs in the court below; the railroad company, appellant, was defendant there. From a judgment in plaintiff's favor defendant appealed to the supreme court.  The case was once before in the supreme court and is reported, *Bussey* v. *Gulf & Ship Island Railroad Co.*, 79 Miss., 597.

The suit was an action for damages by the next of kin of Thomas B. Bussey, who was killed by being run over by the freight train of defendant on which he was the front brakeman. The declaration alleged that while the train was in motion, and when the deceased, in the orderly discharge of his duties, walked out on the running board of the locomotive, a car of the train was derailed, causing a sudden and violent stop and jerk of the train, in consequence of which deceased was thrown off the train and run over and killed; that such derailment was caused by a loose and sunken joint between two rails, which defendant negligently suffered to be out of repair.  Defendant

pleaded the general issue, and the contributory negligence of deceased in going out on the running board of the locomotive, and thence to the pilot, while the train was in motion, and in recklessly placing himself on the track in front of the train while it was in motion.    The evidence for the plaintiffs shows that deceased was head brakeman on the freight train of the Laurel branch of defendant railroad, which intersects the main line at Saratoga.    The trains on this branch usually come into Saratoga and switch off on a sidetrack.    The branch line runs east and west, and five hundred feet east of the switch on the branch line there is a trestle one hundred and fifty-four feet long over a stream eight feet deep, and still further east another trestle one hundred and eighty-four feet long.    Trains coming into the switch sometimes stop for the switch to be thrown, and sometimes simply slow up, and the head brakeman would get off and run ahead of the train and throw the switch before the train got to it.    On the 18th day of March, 1901, the train on which deceased was brakeman came into Saratoga, and was running about three or four miles an hour when it reached the trestle farthest east.    At the eastern end of this trestle there was a low joint in the road, and at this point the trucks of one of the freight cars, near the rear end of the train, was derailed, and the wheels ran along on the crossties for about sixty feet, when they were thrown crossways the track, and the train stopped.    Deceased was found near the western end of the western trestle, having been run over and mutilated by the engine and several fright cars.    The distance from where the body was found to the switch was four hundred and seventy-four feet, and that the body was found where the engine would have been on the track when the derailment occurred.    It was deceased's duty to get off the train and throw the switch, and that, the last seen of him, was when he got out of the cab window on the running board of the engine, ostensibly to perform this duty.    The evidence does not disclose positively how deceased came to his death.    The evi-

dence for defendant was to the effect that there was no low or defective joint, as testified to by plaintiff's witness, but there was a fish bar under the joint, and that the roadbed had not been repaired, and trains had constantly passed over the place for a long time since the accident in perfect safety. The engineer testified that Bussey was reckless, and that he had remonstrated with him about getting on the pilot of the engine; that he last saw deceased going out of the fireman's window, towards the front of the engine; that some one gave a signal that the switch was open, and the train went right on in, the switch having been opened by Bussey or some one else. If Bussey opened the switch, the point at which his body was found shows that he came back towards the moving train.

E. J. Bowers and McWillie & Thompson, for appellant.

The evidence showed that the deceased had left the cab of the locomotive presumably to throw a switch, and that at the time of the derailment the train was going only three or four miles an hour, there being a work train on the track ahead of it which necessitated very slow progress; while there were sixteen cars in the train, but one was derailed, and that this one, which was the fifth car from the caboose at the rear end, was not thrown off the roadbed where the accident happened, but simply off of the rails. The plaintiffs proved by one of their own witnesses that at the time of the derailment the train was going only three or four miles an hour, and it was shown by a witness for the defendant that the train was working no steam, was barely moving, and would have stopped anyhow in another car length. It further appears that the derailed car car ran along on the ties fifty-seven feet, just about a car length, when the truck seems to have turned lengthwise with the track and the train stopped. There was no reason why there should have been any jar or jerk at the forward end of the train, from the fact that one car near the rear end of the train ran along on the ties, and the train was evidently about to stop anyhow when the truck

was displaced.    It may well have followed that by the time the slack of the train was taken up from car to car the derailment of the car near the end would have caused no perceptible jar at the forward end of the train.    Certainly the plaintiffs produced no evidence of any jar as far forward as the locomotive, and the defendant showed by the fireman, Reames, who was on the locomotive, that there was no perceptible jar at that point, and it did not attract the attention of the conductor, Brazil, who was also on the locomotive and did not notice when the derailment occurred.

This is an important matter in the consideration of this case, for it is claimed that the deceased was jarred from the locomotive where there was no jar, and also because unless the deceased was killed in consequence of some jar of the locomotive resulting from the derailment of the car, it is immaterial whether or not the defendant had negligently left out of repair the sunken joint which was alleged to be the cause of the derailment.

Furthermore, as will be hereinafter more fully considered, the plaintiffs did not show whether the deceased came to his death before the train stopped or after it again moved forward, or whether or not it resulted from his standing on the track in front of the approaching locomotive and the eleven forward cars which had been cut loose from the derailed car on the trestle, and the failure to repair the sunken joint, the only act negligence alleged, may have been entirely without import or relevancy.

The plaintiffs introduced three witnesses, one of whom is the brother of the deceased.    Two of them testified that there was a sunken joint on the earth near the end of the trestle at the next crosstie but one to the end of the trestle; the third testified that there was no low or sunken joint within a few inches of the end of the trestle, as testified by the others; that the joint was not near the trestle, but was on the hard woodwork of the same, and had not sunk any and could not sink, and that

the nearest joint on the ground was thirty feet distant. The testimony of this last mentioned witness of the plaintiffs is overwhelmingly confirmed by the evidence of the defendant.

But the undisputed evidence makes the pretense that there was a dangerous joint at the point in question absolutely farcical. It is shown by witnesses on both sides of the case that there has never been any work done at the joint in question; that it had remained ever since the accident exactly as it was at the time of the trial; that trains had been passing over it several times a day for nearly two years, and there had never been any sort of ill consequence from its use. The same crossties are still there with the marks on them, etc., and in all of the long period that had elapsed it had served every purpose of a safe track. Moreover, the plaintiffs' star witness, Harrell, admits that the joint was secured by a fishbar connection, and this sort of connection is shown to consist of a plate of steel from eighteen inches to four feet long, rolled so as to fit on the sides of the rails, which are end to end, and when fastened to the rails with bolts holds the ends of the rails in place and makes virtually a solid rail. Where this connection is employed there is practically no joint and no sinking of the kind described as taking place at low joints.

Moreover, it is quite evident that this derailment, which had no connection with the injury of the deceased, was caused by an occurrence which no care can guard against and in respect to which negligence was not charged, viz.: the breaking and falling of a brake shoe over which the wheels of the car passed.

The plaintiffs did not prove that the deceased fell or was thrown from the locomotive at all, either by a sudden jar or from any other cause, and the evidence strongly negatives the idea that he came to his death in that way. This failure of proof is very important, for the deceased being an employe the statutory presumption of negligence does not arise, although the injury resulted from the running of defendant's train. *Short* v. *Railroad Co.,* 69 Miss., 848.

He certainly was not thrown, nor did he fall from the running board of the engine, as alleged in the declaration, for it is undisputed that his body was found in the middle of the track between the rails, the lower half thereof hanging down between the crossties, and the evidence shows that the running board on each side of a locomotive projects out over the rails, and that it is a physical impossibility for a person to fall or be thrown therefrom so as to come down in the middle of the track. The witnesses say that in such case one would fall on the outside of the track, and it is as absurd to expect one so falling to be in the middle of the track as it would be to suppose that a person who had rolled over the eaves of a two-story house would alight in the center hall of the first story.

Moreover, it is to be presumed that the deceased left the cab of the locomotive to arrange the switch so as to admit the train into the "Y" where it was destined to go, and a few minutes afterwards a lantern signal was given at the switch to come forward, and when the train proceeded to go forward the switch was found to be all right, and as it should have been had he adjusted it. It is conclusive on the undisputed evidence that he went forward and adjusted the switch and recklessly and without cause went back on the trestle to meet the train he had signalled to advance, instead of waiting for it at the switch, where in the proper discharge of his duty he would have resumed his place on the train.

It was sought on the trial to show that the deceased did not have time to go forward and open the switch and get back to the place of the accident, and this through many confusing questions put to the conductor and fireman, but the court will observe that those witnesses steadily insisted that they did not then foresee the importance of giving attention to this, and that their idea of the lapse of time was not sufficiently accurate to say whether he had time to do so or not.

It was not shown how the deceased came to his death, and as

this court has well decided, a jury is not warranted in imposing liability upon a conjecture.

Indeed, the evidence strongly tended to remove all doubt as to the matter by showing that the deceased did not receive the fatal injuries sustained under circumstances which made the defendant chargeable with the negligence alleged, but in a manner wholly different from which no imputation of negligence could arise.

The deceased was evidently killed while in front of the engine and while the train was in motion. Does it make any difference in legal contemplation whether he met his death while attempting to return to the advancing train or while descending from the pilot? In either case he was guilty of the gravest contributory negligence. It is hard to imagine anything more reckless than an attempt to alight on a trestle at night in front of the pilot of a moving train, when the smallest miscalculation of distance, the slightest misstep, the briefest imaginable detention would result in fatality. If that is what was done by the unfortunate young man, he was certainly entitled to the reputation for recklessness which he had among his fellow employes.

The plaintiffs relied greatly on the testimony of the conductor that other employes and himself when a brakeman had been equally reckless, but that in no way affects the case. He shows that it was a dangerous feat, that the deceased had a right to remain on the train until it stopped, and that his getting in front of the engine was wholly unnecessary, as the train was about to stop and was going to stop in ample time for him to open the switch in safety. The plaintiffs also cried aloud over the fact that the conductor saw the deceased go out of the window on the running board and pass forward without stopping him. In this connection, we ask the court to note that the conductor gave the deceased no order to do anything, much less to take the great risk he assumed, and that even had the con-

ductor been able to anticipate that he would try to descend in front of the pilot before the train stopped, his failure to stop the deceased, if indeed he had opportunity to do so, would impose no liability on the defendant. It is shown that the conductor had cautioned him against his recklessness, remonstrating with him against this very thing of getting on and off the pilot of moving trains, telling him he would be killed sooner or later, and even threatening to discharge him if he did not desist. The conductor did not recollect whether or not he so remonstrated with him on this last trip, but mentioned Taylorsville as one of the places where he did so, and Mr. Dabbs, one of plaintiff's witnesses, shows that he did so on this very trip and that the point was Taylorsville, only nineteen miles from Saratoga, something less than an hour's run.

No argument is needed to satisfy any unbiased mind that if the deceased undertook to descend from the pilot while the train was in motion at night and upon a bridge, he was guilty of contributory negligence, and we will not discuss the question but content ourselves with referring the court to the diagram given in the Standard Dictionary under the title "locomotive" for the location, etc., of the running board and pilot, together with the testimony of the conductor in regard to the character, construction and uses of those parts.

*Alexander & Alexander,* for appellees.

The cause of the death — that is, the derailment — was clearly shown, but the exact manner of it can never be positively ascertained. A freight car moving about four miles an hour was derailed, and after running a few feet on the crossties the trucks turned suddenly around lengthwise of the track on a new and strongly built trestle, and as the steam on the engine had been shut off, the train suddenly stopped. It could not possibly go further, as the wheels of the trucks fell between the ties on the trestle, and a movement of even a foot or two

would necessarily have torn the trucks from the car or lifted the end of the car up and over the trucks, and as the proof shows, a single crosstie was broken by the strain when the train stopped. Certain it is that a long train, going at the rate of three to four miles an hour, was suddenly derailed and stopped more than four hundred feet from the switch.

We have, therefore, the case of a long freight train moving along with the steam off under its own momentum suddenly stopped by one of the trucks of the car being wedged in immovably unto a trestle, and as it had to stop instantly and completely and no couplings broken, the whole train had to stop just as suddenly. Bussey at the time was somewhere about the engine, where his duties were calling him. No one saw him fall, but his body was found after the derailed car was uncoupled and the forward part of the train pulled out. His body was found just where he was at the time of the derailment. Not only do the company's own witnesses swear to this fact, but it is shown by taking the number of the box cars ahead of the car derailed and taking their average length and computing the distance to the engine and then comparing with the distance from where the derailed car was found to the point where the body was found. Certain it is that Bussey fell from that engine, and it is equally certain that his fall was coincident in time with the derailment and consequent sudden stopping of the train.

The cause of the derailment was a low joint. There is some conflict in the evidence as to whether the joint was so low or loose as to be dangerous, but the finding of the jury is conclusive of this question of fact.

There was an effort to show that Bussey was reckless in the matter of jumping off and on the pilot of a moving engine. We concede the jumping off or on of a moving train would be contributory negligence, whether the person was ordinarily reckless or not. In that respect it seems to us that the evidence

is wholly immaterial. We suppose it will be contended .that it is material in order to support the conjecture that he endeavored to jump on the pilot, after having opened the switch, this being the defense set up in the second plea or notice under the general issue.

It is not averred, or attempted to be, that in what Bussey did do he had ever been guilty of negligence, or in fact that it was negligence. On the other hand it was shown by an experienced railroad man that he had been out on the running board when the train was moving at the rate of twelve miles an hour, and that it was not dangerous. In fact, Brazil testified that the running board is placed there to enable employes to go around to the front while the train was running and without stopping the train. There was "a handhold around the front of the boiler on the engine." Harrell further testified that he has seen thousands of employes do what Bussey did, and that it was no more hazardous than any other place on the engine. The usual place of a brakeman between stations, when he has no duty to perform, is on top of the box car, and the rules of the company require him to be there until he has to go forward or backward in the discharge of his duties. Surely it cannot be any more dangerous, or nearly so dangerous, to be standing on the footway, which is made to stand on and where there is a handhold made for the purpose of holding on to, than it is to stand without any handhold on top·of a box car.

Numerous instructions were granted for the defense which gave it more than it was entitled to.

While we do not invoke the statutory presumption of negligence, we say that we have abundantly shown the cause of the injury in the derailment. It is not required to establish causal connection between the negligent act and the injury beyond every reasonable doubt. It may be shown by circumstances. In fact, it is most often shown by circumstances. The rule that causal connection may be shown by circumstances and may be

inferred from the fact that there was no other visible cause than the one shown is well recognized by the authorities.

Our courts have frequently held that this causal connection may be shown by circumstances. Even when the statutory presumption is invoked the plaintiff must yet show connections between the act of negligence and the injury. Juries have been allowed to infer such connection in many cases, such as the presence of dead animals near the track where there was no other cause shown besides running the train. Again, fires . originating near the track, with no other known source for the fire, are inferred to passing engines.

Both negligence and causal connection may be shown by circumstances and a fair preponderance of the evidence. 21 Am. & Eng. Enc. Law, 516; *Brownfield* v. *Chicago, etc., R. Co.,* 5 Am. Neg. Rep., 331, 334; *Union, etc., R. Co.* v. *DeBusk,* 8 L. R. A., 350; *Daileman* v. *Saalfeldt,* 175 Ill., 310; s. c., 48 L. R. A., 753; *Woodman* v. *Metropolitan R. Co.* (Mass.), 4 L. R. A., 213; *Penn. R. Co.* v. *Huber,* 5 L. R. A., 439.

The burden of showing contributory negligence is on the defendant. It is not incumbent on the plaintiff to do more than show the negligence (the low joint) and reasonable consequence thereof (derailment), and the natural consequence of this derailment (the fall), it then devolves upon the defendant to show that Bussey was guilty of contributory negligence. This they have not done. They do not even show a theory which is tenable. Two theories are set up but neither of which is supported. There is nothing but vague conjectures to support the defense of contributory negligence.

Not only is it true that the defense of contributory negligence must be affirmatively shown and cannot be established by mere conjecture, as above stated, but it is well established that in favor of due care the jury may consider the natural instinct of self-preservation. See *Gay* v. *Winter,* 34 Cal., 153; *Denver Tramway Co.* v. *Reid,* 4 Col. App., 53, 35 Pac. R., 269.

To the same effect *Atchison R. Co.* v. *Hill,* 57 Kan., 139; s. c., 45 Pac. R., 185; *Northern Central R. Co.* v. *State,* 31 Md., 357, 100 Am. Dec., 65.

Argued orally by *T. A. McWillie* and *R. H. Thompson,* for appellant, and by *C. H. Alexander* and *Chalmers Alexander,* for appellees.

WHITFIELD, C. J., delivered the opinion of the court.

This action is founded upon the negligence of the master itself, in not providing a safe way, and was hence manifestly maintainable, without reference to section 193 of the constitution. *White* v. *Railroad Co.,* 72 Miss., page 12, 16 South., 248. That section is therefore not involved in this case. The only point worthy of serious consideration is whether the plaintiff was guilty of contributory negligence. The theory that Bussey got down off the pilot on the trestle, went forward, threw the switch, and returned towards the engine on the trestle—the engine moving all the while at four miles an honr—and was killed in trying to jump on the pilot, is utterly untenable. It was, in view of the distance from the point where he would have so gotten off, to the switch, a physical impossibility that the injury could have occurred in that way, as a simple mathematical calculation will demonstrate. The theory that the derailment was caused by a brake shoe falling on the rail has the testimony of but one witness, and that of the most shadowy kind, to rest on. The presence of the brake shoe may very easily be accounted for by the fact of the wrenching around under the cars of the trucks. The testimony makes no such case. The theory of the plaintiff is that the derailment of the cars caused a sudden, violent jerk, which threw the plaintiff, and caused him to fall from the front of the engine to the trestle, and that he was then run over and crushed by a number of cars before the train came to a stop. That he was run over and crushed is shown by the manner in which his body was muti-

lated.    That it was a sudden and violent jerk or jar of the train which projected him forward on the middle of the trestle has been found by the jury to be the most reasonable and probable cause of his death.    The jury evidently found it more reasonable than the opposite theory, that he would attempt to get off the train moving about four miles an hour, on a trestle. There was no occasion to do so.    It was perfectly easy for him to have waited until the train got on solid ground, and then have gotten off, gone forward, and thrown the switch.    None of the theories presented by the defendant commended themselves to the jury as at all probable or reasonable.    They evidently discredited both the statement that any derailment signal was given, and the other most remarkable statement by one of the crew that he felt no jar from the derailment.    When one considers the nature of the mutilation of the body, the fact that trucks were wrenched around at right angles under the derailed car, that one of the new crossties was actually broken by the violence of the movements of the train, the distance run by the cars on the crossties of the trestle after the derailment, and the further fact that the train was moving at about four miles an hour—a heavy freight train, with sixteen cars—the statement by one of the crew that he, under these circumstances, felt no jar at all, was naturally discredited by the jury.    What we regard as very strongly convincing evidence, quite sufficient to warrant the correctness of the jury's conclusion, is the admitted fact—a fact testified to by defendant's witnesses—that the body of Bussey was found at the point where the engine would have been when the derailment occurred.    This is a most pregnant fact, from which the jury may very reasonably have inferred that, at the very instant of the derailment, Bussey was thrown by the jar from the front of the engine to the middle of the trestle, and there run over and killed.    It is shown by the testimony, so far as contributory negligence is concerned, that it is not unsafe to be on the running board leading round to

the front of the engine.    It was customary for employes to go around on that running board, holding by the hand hold, and light the headlight, while the train was in motion.   We think the conductor meant by the language that he would not have told Bussey more than twice to go, before he would have "fired" him, that it was Bussey's duty, and, if he had to tell him more than twice to do his duty, he would have discharged him.   That seems the plain meaning, from the context.. What the jury evidently believed was that Bussey went around to the front of the engine, and was waiting there for the train to get on solid ground, with no purpose at all of getting off on the trestle, and this is as reasonable an inference as can be drawn from the testimony—we think the most reasonable one.   If the evidence had shown that Bussey was thrown off or fell off whilst trying to descend from the front of the engine to the trestle, he was clearly guilty of contributory negligence of the most flagrant kind, the train moving at about four miles an hour.   But when the distance from the end of the trestle to the switch is considered, and the fact that Bussey had the most abundant time in which to have gotten off on the ground and have thrown the switch, there is no rational ground upon which to base the conjecture that he entertained the foolhardy purpose of attempting to descend from that moving train to the trestle.

We have given every phase of the case painstaking consideration, and are not able to say that the verdict is manifestly wrong.

*Affirmed.*